[Civ. No. 23549. First Dist., Div. One. July 20, 1966.]

COUNTY OF ALAMEDA, Plaintiff and Appellant, v. JOHN ESPINOZA, SR., Defendant and Respondent.

J. F. Coakley, District Attorney, R. Robert Hunter, Chief Assistant District Attorney, and Ben H. Zuppan, Deputy District Attorney, for Plaintiff and Appellant.

Bertram Edises, for Defendant and Respondent.

SIMS, J.—This case comes before this court for hearing and decision pursuant to an order granting transfer following certification by the appellate department of the superior court that such transfer appears necessary to settle important questions of law. (Cal. Const., art. VI, § 4e; Code Civ. Proc., § 988t; and Cal. Rules of Court, rules 61-65.) The question presented is stated to be "whether Section 903 of the Welfare and Institutions Code[1] is unconstitutional in that it denies defendant-respondent herein equal protection of the law in violation of the Fourteenth Amendment of the United States Constitution and Article I, Sections 11 and 21 of the California Constitution."

On May 4, 1965, plaintiff and appellant County of Alameda filed its complaint in the municipal court against defendant and respondent, as the father of John Espinoza, Jr., a minor, to recover the cost of the care, support and maintenance of

---

[1]Section 903 of the Welfare and Institutions Code provides: "The father, mother, spouse, or other person liable for the support of a minor person, the estates of such persons, and the estate of such minor person, shall be liable for the cost of his care, support, and maintenance in any county institution in which he is placed, detained, or committed pursuant to the order of the juvenile court, or for the cost to the county in which the juvenile court making the order is located, of his care, support, and maintenance in any other place in which he is placed, detained, or committed pursuant to the order of the juvenile court. The liability of such persons (in this article called relatives) and estates shall be a joint and several liability."

All further references are to sections of the Welfare and Institutions Code unless otherwise noted.

said minor. From an amended complaint filed June 30, 1965, it appears: that pursuant to an order of the juvenile court the minor was ordered detained on January 13, 1964, in juvenile hall, a county institution, and thereafter committed to Alameda County Boys' Camp; that he had been receiving care, support and maintenance in those institutions from January 13, 1964, to and including May 2, 1965; that the cost thereof was $1,208 ;[2] and that no part thereof had been paid.

The father demurred on the grounds indicated by the certified question. The trial judge sustained the demurrer without leave to amend upon the authority of *Department of Mental Hygiene* v. *Kirchner* (1964) 60 Cal.2d 716 [36 Cal.Rptr. 488, 388 P.2d 720], (1965) 62 Cal.2d 586 [43 Cal.Rptr. 329, 400 P.2d 321], and *Department of Mental Hygiene* v. *Hawley* (1963) 59 Cal.2d 247 [28 Cal.Rptr. 718, 379 P.2d 22]. Judgment was entered accordingly and upon appeal by the county was affirmed by the appellate department of the superior court without opinion. The county petitioned for certification, and the certification and order leading to consideration by this court ensued.

There is no Jovian shaft from Olympus which illuminates an express constitutional formula which embraces this case. It is necessary to examine the existing precedents, the reasoning and policies upon which they are based, and the history of the legislation in question in order to determine the propriety of the decision which represents the uniform opinion of four learned judicial minds. This examination indicates that there is no compelling precedent which brands the enforcement of the parental duty to support as unconstitutional in circumstances short of detention in jail or in a mental institution in connection with the prosecution of criminal proceedings which would lead to the child's conviction and sentence for a crime. Although the reasoning and policies advanced to preclude statutory imposition of liability for support upon a relative not otherwise responsible therefore, or upon a parent under

---

[2]Although the amended complaint alleges that the sum due is "as established pursuant to Welfare & Institutions Code, Section 903," there is no provision in that section for "establishing" an amount. Compare section 904 which provides for determining the cost of care in a county institution, and section 905 which provides for establishing the amount that a responsible relative is financially able to pay. The county has asserted before the appellate department of the superior court and before this court that the defendant has "the ability to pay said sum as determined under section 905 of the Welfare and Institutions Code," but the allegations of the amended complaint merely negate a reduction, cancellation or remission of the sum otherwise claimed.

the circumstances outlined above are broad enough to embrace the situation presented herein, they should yield to counter-vailing policy predicated upon statutory history and the gen-eral philosophy of the Juvenile Court Law.

Reference to the Juvenile Court Law reflects a varying spec-trum of interference in the parent-child relationship which is dependent upon the particular facts giving the court jurisdic-tion. (Cf. §§ 600, 725, subd. (c) ; 726, subds. (a) and (c) ; and 727 with §§ 601; 725, subds. (a) and (b) ; 726, subds. (a), (b) and (c) ; and 730; and with §§ 602, 725, subds. (a) and (b) ; 726, subds. (a), (b) and (c) and 731.) The disposition, as qualified by the foregoing categorization, may vary from in-formal probation with the consent of the parent or guardian of a minor (§ 654), through formal probation (§§ 725, subd. (a) and 726), to removal from custody (§ 726, subds. (a), (b), and (c)) and commitment to a person, to an association, society or corporation, to a suitable family home or private institution or to a public agency (§ 727) ; to a county juvenile home, ranch, camp or forestry camp (§ 730) ; or to the Youth Authority (§ 731).

In the instant case the father has requested that judicial notice be taken of the proceedings leading to the commitment of his son and the county has conceded: that the minor was born September 15, 1948, and was made a ward of the court prior to December 6, 1963, on which date a supplemental peti-tion (see § 777) was filed charging him with violation of sec-tion 217 of the Penal Code; that the allegations of that peti-tion were found to be true and he was found to be a person described by section 602; that his welfare required that his custody be taken from his parent; and that he was committed to the Alameda County Boys' Camp. (See § 730.)[3]

At one end of the spectrum section 196 of the Civil Code makes it clear that the responsibility for the support of the minor is with the parent so long as he is entitled to and has actual custody of the minor. At the other end, it is clear that if criminal proceedings against a minor over the age

---

[3]The father refers to a further order, entered on a later supplemental petition filed April 5, 1965, wherein it was found that the minor violated section 10851 of the Vehicle Code, the prior order was revoked and he was committed to the Youth Authority (see §§ 731 and 1769). The question of reimbursement for the amounts payable by the county to the Youth Authority (see §§ 903 and 912 and cf. *Svoboda* v. *Superior Court* (1923) 190 Cal. 727, 731 [214 P. 440] with *Department of Mental Hygiene* v. *McGilvery* (1958) 50 Cal.2d 742, 757-758 [329 P.2d 689] and *Department of Mental Hygiene* v. *Hawley* (1963) 59 Cal.2d 247, 254 [28 Cal.Rptr. 718, 379 P.2d 22]) is not at issue in these proceedings.

of 18 years are not certified to the juvenile court (cf. § 604, subd. (a) with § 604, subd. (b)) there is no right to reimbursement for the expenses of the support of such minor while he is detained in connection with those proceedings, even though it be as a mental patient pursuant to the provisions of section 1026 or sections 1368 et seq. of the Penal Code. The provisions of section 6650 of the Welfare and Institutions Code which purported to give a right to reimbursement under such circumstances were held to be unconstitutional. (*Department of Mental Hygiene* v. *Hawley, supra*, 59 Cal.2d 247, 256;[4] and cf. Welfare and Institutions Code section 703 which purports to give a right to reimbursement for costs of observation at a state mental institution of a minor found to be subject to the Juvenile Court Act.) Presumably the same rule would apply where the juvenile court, pursuant to the provisions of section 707, directs that criminal prosecution be commenced or resumed because a minor of requisite age is not a fit or proper subject for juvenile court proceedings.

The provisions of the Juvenile Court Law as it has existed throughout the years have consistently provided for reimbursement or payment by the parents for the cost of the care, support and maintenance of the minor, at least to the extent they were able to do so.[5] The provisions now found in sections 900-914 are substantially the same as those found in sections 860-871 (Stats. 1937, ch. 369, §§ 860-870, pp. 1048-1051 as amended through Stats. 1959, ch. 2145, pp. 5112-5114) prior to the 1961 revision. (Stats. 1961, ch. 1616, §§ 900-914, pp. 3499-3503.) These provisions were approved by the Governor's Special Study Commission on Juvenile Justice with but minor

[4]The facts in *Hawley* reflect that the son was born in August 1936 and was committed pursuant to the provisions of sections 1368 et seq. of the Penal Code in February 1956 during his 19th year. Recovery was sought from the father for the period from January 1956 (apparently custodial care was furnished in connection with precommitment examination) through October 1960, which included approximately 20 months of minority. (59 Cal.2d at p. 249.)

[5]See Stats. 1889, ch. 108, p. 111, § 24 at p. 117 and § 29 at p. 119; Stats. 1903, ch. 43, p. 44, § 8 at p. 47 (provision "by voluntary contribution or otherwise"); Stats. 1905, ch. 610, p. 806, § 17 at pp. 812, 813 (adding to Act of 1903 a new section 16 which incorporates provision of former section 8, and adds authorization to order that the expense of maintenance be paid by the parents); Stats. 1907, ch. 427, p. 777 (amending section 16 of Act of 1903 as amended 1905); Stats. 1909, ch. 133, p. 213, § 21 at p. 224; Stats. 1911, ch. 369, p. 658, § 21 at p. 671; Stats. 1913, ch. 673, p. 1285, § 23 at p. 1301; Stats. 1915, ch. 631, p. 1225, § 11 at p. 1234; Stats. 1937, ch. 369, p. 1005 (Welf. & Inst. Code) §§ 863-868 at pp. 1049, 1050; Stats. 1959, ch. 2145, p. 5112, §§ 1 to 8 at pp. 5112-5114 (revising code §§ 863-868).

revisions. (See the commission's "Recommendations for Changes in California's Juvenile Court Law" (Nov. 1960) pp. 90-94.) In 1965 after the pronouncements in *Hawley* and *Kirchner* the Legislature added section 903.1 to the code to provide that the same persons as named in section 903 would be liable for the cost of legal services rendered to a minor by the public defender or a private attorney appointed by the juvenile court. Sections 904 to 908 were revised accordingly to include reference to "cost of legal services" along with reference to "care, support and maintenance." (Stats. 1965, ch. 2006, pp. 4535-4537.) By the addition to and republication of the provisions regarding parental liability the Legislature demonstrated that it adhered to the propriety of the system of reimbursement theretofore established despite the questions posed by *Hawley* and *Kirchner*.

Under the prior law (Stats. 1915, ch. 631, § 11, p. 1234 as amended Stats. 1921, ch. 512, § 3, p. 803) it was held "that the court may direct the parent, or parents, of such ward, financially able to do so, to reimburse the county, regardless of whether or not he, she, or they may have been deprived of the custody of the child in any previous divorce proceeding . . . [and] that the respondent did not act in excess of its jurisdiction in requiring the petitioner to reimburse the county of Alameda for the expense of the support and maintenance of his minor child at the Preston School of Industry." (*Svoboda v. Superior Court* (1923) 190 Cal. 727, 731 [214 P. 440].) A similar result was reached for the cost of foster home placement for a minor who was made a ward because she was in danger of leading an immoral life. The decision, written by Peters, P. J., examined the provisions of sections 860-864 as originally incorporated in the code (Stats. 1937, ch. 369, §§ 860-864, pp. 1048, 1049) and amended in 1940 (Stats. 1939, ch. 1099, § 2, p. 3028); and rejects the contention that the mother had no legal obligation to support her child because she had been deprived of her custody by both a divorce decree and the order of the juvenile court. (*In re Carboni* (1941) 46 Cal.App.2d 605, 609-612 [116 P.2d 453].) The writer of the opinion observed: "This contention, if approved, would mean that a mother who had been deprived of the custody of her child because of her wrongful conduct, could not be compelled to assist the county in supporting the child, even though able to pay for such support." (46 Cal.App.2d at p. 609.)

It is asserted that the rationale of *Hawley* renders the foregoing cases obsolete because they sanction an unconstitutional practice. This view is supported by the following language:

"The enactment and administration of laws providing for sequestration and treatment of persons in appropriate state institutions—subject of course, to the constitutional guaranties—who would endanger themselves or others if at large is a proper state function; being so, it follows that the expense of providing, operating and maintaining such institutions should (subject to reasonable exceptions against the inmate or his estate) be borne by the state. . . .

"The mere fact that innocent persons are relatives of an accused or convicted person does not deprive them of *their* fundamental rights or constitute a lawful basis for a statute or judgment whereby their property may be taken to pay the costs of prosecuting, detaining, or otherwise treating the accused. No decision or authority to the contrary has been cited or discovered." (59 Cal.2d at pp. 255, 256.)

The same thought is expressed in *Kirchner* as follows: "Whether the commitment is incidental to an alleged violation of a penal statute, as in *Hawley*, or is essentially a civil commitment as in the instant case, the purposes of confinement and treatment or care in either case encompass the protection of society from the confined person, and his own protection and possible reclamation as a productive member of the body politic. Hence the cost of maintaining the state institution, including provision of adequate care for its inmates, cannot be arbitrarily charged to one class in the society; such assessment violates the equal protection clause." (60 Cal.2d at p. 720.)

This court recently reviewed the foregoing pronouncements in *In re Dudley* (1966) 239 Cal.App.2d 401 [48 Cal.Rptr. 790] (hearing by S. Ct. denied March 14, 1966). Therein the conflict in policy was set forth as follows: "If *Kirchner* stands for the proposition that when the state, in the exercise of its promotion of the general welfare, commits a person either for the protection of society or for his protection or rehabilitation, or any combination thereof, it cannot thereafter seek reimbursement except from such person or his estate, that case then is determinative of the matter in issue. On the other hand, if *Kirchner* is limited to its facts and does not preclude the state from seeking reimbursement from those otherwise legally responsible for the care, support and maintenance of the person treated, inquiry must be directed to a determination of whether or not respondent is responsible for the support of her adult daughter; and, if so, whether the state has properly provided for the enforcement of any obligation arising from that responsibility." (239 Cal.App.2d at p. 407; fns. omitted.)

*Kirchner* was distinguished because of the difference in the relationship between the person treated and the relative to be charged. The opinion recites: "The distinction between the class of persons upon whom liability is imposed by section 6650 [same section fn. 4] (*Kirchner*), and section 5260 [5250] (this case), is significant. Moreover, the former section purports to impose liability, whereas the latter merely prescribes a procedure to enforce what liability for support may otherwise exist. *Kirchner* does not expressly say that a person otherwise liable for the support of an incompetent is denied equal protection of the law because the state requires him to contribute to the support and maintenance of the dependent while he is receiving treatment from the state. In fact, *Kirchner*, recognizes the liability of the inmate or patient and his estate for his care by emphasizing the language from *Hawley* so stating. (60 Cal.2d at p. 720; and see: *Guardianship of Hicks* (1964) 228 Cal.App.2d 629, 632 [39 Cal.Rptr. 698].) Furthermore, from the opinion's analysis of *Guardianship of Thrasher* (1951) 105 Cal.App.2d 768 [234 P.2d 230], and *Estate of Risse* (1957) 156 Cal.App.2d 412 [319 P.2d 789] (60 Cal.2d at p. 719), and its failure to qualify the holding of those cases (see *id.* at p. 723), which required the husband to support his wife while she was committed to the state mental hospital even though she had an estate of her own, it may be inferred that it is not a denial of equal protection of the law to provide for payments by a spouse who is otherwise liable for the support of the patient. (See: Note, 12 U.C.L.A. L.Rev. (1965) 605, 609, n. 20; and Schauer, J. Dissenting, *Department of Mental Hygiene* v. *McGilvery* (1958) 50 Cal.2d 742 at p. 764 [329 P.2d 689].) Similar considerations indicate that it is not unconstitutional to seek repayment from a parent who is otherwise obligated to support a minor child. (Cf. Civ. Code, § 196; and see Welf. & Inst. Code, § 2576 [now 17300] as interpreted in *County of Alameda* v. *Kaiser* (1965) 238 Cal.App.2d 815, 818 [48 Cal.Rptr. 343].)" (*Id.*, 239 Cal.App.2d at pp. 408-409.)

*Hawley* in turn was distinguished because of its recital—"that the son was 'held for the primary purpose of protection of the public in the course of the administration of laws prohibiting crime' (59 Cal.2d 247, 255)." (*Id.*, at p. 411.)

In *County of Alameda* v. *Kaiser* (1965) 238 Cal.App.2d 815 [48 Cal.Rptr. 343], the right of a county to recover for treatment furnished a minor son in a county hospital was upheld. The opinion recites: "We conclude that Philip must

be deemed a minor. Our question then is whether the recent ruling of our Supreme Court (*Department of Mental Hygiene* v. *Kirchner, supra,* 60 Cal.2d 176) bars liability of defendant mother.

"Parental liability for support of a minor child is of ancient origin. It was recognized by such writers as Coke and Blackstone (1 Schouler, Marriage, Divorce, Separation and Domestic Relations, 857), and was the subject of an old English statute (43 Eliz. I, c. 2). It has long been statutory in California (Civ. Code, §§ 196, 206, 207). One reason for imposing this obligation is to prevent the child from becoming a public charge (*Federal Mutual Liability Ins. Co.* v. *Industrial Acc. Com., supra,* 195 Cal. 283, 289-290 [233 P. 335]). This long-recognized liability, often enforced, has not been held to be based upon an unreasonable classification. Thus *Kirchner's* proscription of denial of equal protection seems to have no application.

"The statutes measuring liability for care and treatment of another in a county hospital (Health & Saf. Code, § 1473; Welf. & Inst. Code, § 2576), permit recovery by the county only to the extent of the responsible party's ability to pay. To the extent that *Kirchner* turns upon possible impoverishment of the party charged for another's care, its rule is thus inapplicable here.

"This case differs from *Kirchner* in another respect. Here, hospitalization was for treatment of physical injuries, a treatment essentially for the benefit of the patient. It was apparently considered beneficial by the mother who sought her child's admission to the county hospital. The element of confinement for the protection of society from the mentally ill, present in *Kirchner*, is not a factor here." (238 Cal.App.2d at p. 818.)

It is urged that section 903 in imposing liability that is "joint and several" attempts to create a liability that is separate and apart from that imposed on a relative by general provisions of law; that it thereby runs afoul of the principle of *Kirchner* (see 60 Cal.2d 716 at p. 719) which construes section 6650 as an unconstitutional attempt to create a new liability; and that it is not saved by *In re Dudley* because, as stated therein, "the former section [§ 6650] purports to impose liability, whereas the latter [§ 5260 as involved in *Dudley*] merely prescribes a procedure to enforce what liability for support may otherwise exist" (239 Cal.App.2d 401 at p. 408). It has been indicated that the liability imposed by

the Juvenile Court Act is separate and apart from that imposed by general law (cf. Civ. Code §§ 196, 196a, 205, 206 and 207 with *Svoboda* v. *Superior Court, supra,* 190 Cal. 727, 729-731; *In re Carboni, supra,* 46 Cal.App.2d 605, 609-614; and see *County of San Bernardino* v. *Simmons* (1956) 46 Cal.2d 394, 398 [296 P.2d 329]). Nevertheless the argument overlooks that portion of *Dudley* in which the *Simmons* case was analyzed, and in which it is stated: "The problem herein, however, is not in determining whether or not appellant can recover in an action brought solely under the provisions of section 206 of the Civil Code, but whether the existence of the liability thereby created demonstrates that it is not a denial of equal protection of the law to require a person subject to that liability to reimburse the county for the care, which in the absence of that furnished by the state and charged to the county (§§ 7009-7011), he would otherwise be required to furnish personally." (239 Cal.App.2d at p. 410; fn. omitted.)

It is concluded that *Kaiser* and *Dudley* establish that reimbursement may be had from the parent for treatment which is voluntarily sought for a minor or dependent child. On the other hand, where a person is held for the primary purpose of the protection of the public in the course of the administration of laws prohibiting crime, no reimbursement can be secured. Should the distinction be predicated upon the involuntary or voluntary nature of the commitment; or should it be based upon the distinction between a dominant purpose to protect society and a dominant purpose to treat the dependent person?

The former test produces paradoxical results as applied to the administration of the Juvenile Court Law. Defendant father would remove from discussion the situations where a parent voluntarily invokes the aid of the juvenile authorities or where an unfit home is involved. The enormity of relieving a parent whose shortcomings have resulted in the loss of custody of the child from the duty to support that child has been heretofore noted in the language of Peters, P. J (*In re Carboni, supra,* 46 Cal.App.2d 605, 609). Although the law categorizes the cases (§§ 600, 601 and 602) the complex family and social backgrounds which evidence themselves before the juvenile court do not lend themselves to simple analysis as to whether the conduct of the minor is the result of the acts or omissions of the parents, or whether the latter can be categorized as "innocent persons" who are merely related to "an accused or convicted person" within the concept of *Hawley* (59 Cal.2d at p. 256). Should contribution be ordered where

parental neglect merely leads to lack of effective care or control of the child (§ 600) and be held unconstitutional because such lack of care or control results in the danger of the child leading an idle, dissolute, lewd or immoral life (§ 601), or results in a violation of law by the child (§ 602)?

■ It is concluded that the propriety of seeking reimbursement cannot be predicated solely upon whether the commitment to the public institution is voluntary or involuntary. It is therefore unnecessary to consider whether the right to enforce the parental duty to support is dependent upon the existence of a parental right to choose a private institution, or the right of the public institution to refuse admission (cf. *In re Dudley, supra,* 239 Cal.App.2d 401, 412-413). Inquiry is directed to ascertaining the dominant purpose of the proceedings which resulted in the loss of custody.

Defendant father would draw the line at where the minor commits a crime. He points out that in this case, where the minor was found to have committed an assault with intent to commit murder, he would, if an adult, be subject to imprisonment for not less than one nor more than 15 years. (Pen. Code, § 217.) He also refers to the failure of the boy's camp program as evidenced by the subsequent offense and commitment to the youth authority (fn. 3). ■ The constitutionality of the enforcement of the parental obligation to support a child cannot depend on the gravamen of the offense committed as distinguished from the disposition ordered and its effect on the parent-child relationship. Under the administration of the Juvenile Court Law the degree of interference with the parent-child relationship is dictated by many factors in addition to the gravity of the offense committed. (See §§ 577, 581, 582, 702, 706 and 741; and Report of the Governor's Special Study Commission on Juvenile Justice (1960) Recommendation No. 12, pp. 30-31; and see *In re Schubert* (1957) 153 Cal.App.2d 138 [313 P.2d 968], *passim.*) ■ Nor can the responsibility or the constitutionality of the enforcement thereof, be dependent upon whether or not the disposition ordered by the court was successful in rehabilitating the minor. Such a test could only be applied after the fact and has no relationship to the disturbance of the normal parent-child relationship effected by the intervention of the juvenile court.

There are suggestions that despite an avowed policy to the contrary the proceedings in juvenile court are for all practical purposes akin to criminal proceedings. ''While the juvenile

court law provides that adjudication of a minor to be a ward of the court shall not be deemed to be a conviction of crime, nevertheless, for all practical purposes, this is a legal fiction, presenting a challenge to credulity and doing violence to reason. Courts cannot and will not shut their eyes and ears to everyday contemporary happenings." (*In re Contreras* (1952) 109 Cal.App.2d 787, 789 [241 P.2d 631]; and see *In re Tahbel* (1920) 46 Cal.App. 755, 759-762 [189 P. 804].) It is significant that the references to the analogy to criminal proceedings are made in connection with the protection of the constitutional rights of the minor. They in no way impeach the general policy set forth in section 502.[6] Although it is recognized therein that it may be necessary to remove a child from the custody of his parents when the safety and protection of the public cannot be adequately safeguarded without such removal (cf. § 726, subd. (b)), or when his welfare cannot be adequately safeguarded without such removal (cf. § 726, subds. (a) and (c)),[7] the emphasis on the home and the purpose "to preserve and strengthen the minor's family ties wherever possible" is manifest.

The analogy to criminal proceedings further breaks down when the procedural and substantive provisions, which are designed to make the parents, as well as the minor, parties to the proceedings, are examined. ▮ The parent is entitled to notice and an opportunity to be heard at all procedural steps, is entitled to counsel, if indigent (§§ 634, 659, subd. (e) and 679), and precise standards are delineated as conditions precedent to either temporary (§§ 628, 635 and 636), or permanent (§ 726) removal from custody. In other words, the proceedings embrace the parent and child, not merely the latter.

In "Standards for Juvenile and Family Courts" (U.S. Dept. of Health, Education and Welfare, Childrens Bureau

---

[6]Section 502 provides: "The purpose of this chapter is to secure for each minor under the jurisdiction of the juvenile court such care and guidance, preferably in his own home, as will serve the spiritual, emotional, mental and physical welfare of the minor and the best interests of the State; to preserve and strengthen the minor's family ties whenever possible, removing him from the custody of his parents only when his welfare or safety and protection of the public cannot be adequately safeguarded without removal; and, when the minor is removed from his own family, to secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given by his parents. This chapter shall be liberally construed to carry out these purposes."

[7]The order in question herein recites, "that the welfare of said ward requires that the present order of supervision be set aside and that his custody be taken from his parent or guardian. . . ." (See § 726, subd. (c).)

Publication No. 437-1966 prepared in cooperation with National Council on Crime and Delinquency and National Council of Juvenile Court Judges) the varying degrees of interference with the totality of parental rights and responsibilities is graphically presented (pp. 24-25). While recognizing that *Kirchner* and *Hawley* raise a question as to the constitutionality of an order for support where the legal custody of the child is removed from the custody of the parent because he has violated a law or ordinance, it recommends that the court be authorized to make an order of support commensurate with the parent's ability to pay (p. 87); and it lists the responsibility for support as a residual parental responsibility which can only be terminated by a legal termination of the parent-child relationship (pp. 17, 19, 20 and 100; and see Civ. Code, § 204).

Experience indicates that in the majority of cases the child will return to its home.[8] Provision is generally made for some sort of probationary or parole period during which there is what has been termed "aftercare supervision."[9] If the program is to be geared to shortening the term for which custody is removed from the parents, and in working with the family to root out the causes for the anti-social behavior, some effort should be made to nurture the residual parental rights[10] and responsibilities.[11] It is not facetious to state that making a parent aware of his obligation to support his child commensurate with his ability may affect his desire to make a change in conditions which will enable the child to accomplish a better adjustment under the parental roof. The alternative, of relieving the parent of all responsibility, is hardly conducive of cooperation in a subsequent program when the child is re-

---

[8] "Neither the right of the parent to the *legal custody* of his child nor the right of a child to live in his own home should be taken away for a time longer than is reasonably necessary. Experience has shown that in general, delinquent children seldom need care away from their own homes for a period of more than 1 or 2 years. Since there may be a small number of children, particularly in neglect situations, needing care for a longer period, orders vesting *legal custody* in an agency in cases of neglect or delinquency should be for an indeterminate period but not to exceed 3 years." (Standards for Juvenile and Family Courts (1966) p. 82.)

[9] See Standards for Juvenile and Family Courts, *supra*, pp. 23, 97-98.

[10] Reasonable visitation, consent or withholding of consent to adoption, and the right to determine the child's religious affiliation (Standards for Juvenile and Family Courts, *op. cit.*, p. 20), and the right to petition for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court (§ 778).

[11] In Marin County the new juvenile court facility is denominated a family rehabilitation center and has been constructed and is operated with the aim of treating the child and his home environment to the end of accomplishing a speedy and successful return to the home.

turned to the home and the parent is asked not only to make adjustments in his behavior toward the child, but also would be faced with renewing an economic burden which the state and local government have shouldered for him. Furthermore, the therapeutic value of the parent's desire to make a home for the child and to prevent a change of custody is acknowledged. Relief from the obligation of support may in some cases serve as a deterrent to such motivation on the part of the parent.

Finally, it may be noted that if the primary purpose is treatment rather mere protective custody, consideration should be given to whether or not the forgiveness of the normal parental obligation of support would constitute a gift of public funds. (See *In re Dudley, supra,* 239 Cal.App.2d 401, 413-415.)

In short, the basic philosophy of the juvenile court recognizes that the normal relationship of parent and child should not be disturbed except to insure protection of the public and the welfare of the child; that where interference with that relationship is necessary and warranted it should not extend beyond what is necessary to effect the necessary corrective measures; and that such measures as are taken should be directed to the restoration of a normal parent-child relationship. (See Report of the Governor's Special Study Commission on Juvenile Justice (1960) pp. 10 and 11, "Basic Principles Underlying Recommendations," and Standards for Juvenile and Family Courts, pp. 1-9, "Philosophy of the Court.") It is the last factor which distinguishes this case from *Hawley.* It is concluded that a parent is not deprived of his property without due process of law, nor is he denied equal protection of the law by being arbitrarily charged for the cost of maintaining a county institution, when he is required to contribute, according to his ability, to the cost of the care, support and maintenance furnished to his child at such institution when the child is confined for the dual purpose of the protection of the public at large and his reformation and rehabilitation to the end that he may return to his family. If the parent is the innocent person referred to in *Hawley* the potential benefits from the rehabilitating process and the fact that he would otherwise be relieved of an obligation inherent in the parent-child relationship furnish considerations which render his contributions proper despite the incidental benefit to the public at large. If he is the neglectful parent there is no reason to exonerate him from responsi-

bility, and he again is distinguishable from a class arbitrarily taxed because of the relationship. ██ ''There is, of course, a presumption in favor of constitutionality, and the invalidity of a legislative act must be clear before it can be declared unconstitutional. [Citations.] ██ Wide discretion is vested in the Legislature in making a classification, and its decision as to what is a sufficient distinction to warrant the classification will be upheld by the courts unless it is 'palpably arbitrary and beyond rational doubt erroneous' and no set of facts reasonably can be conceived that would sustain it. [Citations.]'' (*Patton* v. *LaBree* (1963) 60 Cal.2d 606, 609 [35 Cal.Rptr. 622, 387 P.2d 398].)

██ From what is set forth it is apparent that there is no clear invalidity to the obligation set forth in section 903 which the county seeks to enforce herein, nor can it be said that it is unreasonable to impose the obligation of support on the persons who would have to bear it if the court had not intervened.

The judgment is reversed with directions to overrule the demurrer and grant defendant a reasonable time to answer.

Sullivan, P. J., and Molinari, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied September 14, 1966. Peters, J., was of the opinion that the petition should be granted.